IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| DIANNA ZAMORA, | ) | Civil No. 10-583-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Merrill Schneider
Attorney at Law
P.O. Box 14490
Portland, OR 97293

      Attorney for Plaintiff

Dwight C. Holton, U.S. Attorney
Adrian L. Brown. Asst. U.S. Attorney
1000 S.W. 3rd Avenue, Suite 600
Portland, OR 97204

FINDINGS AND RECOMMENDATION - 1

Gerald J. Hill
Special Asst. U.S. Attorney
Office of General Counsel
Social Security Administration
701 5th Avenue, Suite 2900 M/S 221A
Seattle, WA 98104-7075

       Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Dianna Zamora brings this action pursuant to 42 U.S.C. § 405(g)

seeking judicial review of a final decision of the Commissioner of Social Security (the

Commissioner) denying her applications for Disability Insurance Benefits and Supplemental

Security Income.  Plaintiff seeks an Order reversing the decision of the Commissioner and

remanding the action to the Social Security Administration (the Agency) for an award of

benefits.

For the reasons set out below, the decision of the Commissioner should be affirmed.


**Procedural Background**

Plaintiff filed her applications for benefits on January 12, 2007, alleging that she had

been disabled since September 23, 2006.  After her claims were denied initially on March 20,

2007, and upon reconsideration on November 5, 2007, plaintiff timely requested a hearing

before an Administrative Law Judge (ALJ).

A hearing was held before ALJ Richard Say on September 15, 2009.  In a decision

dated October 6, 2009, ALJ Say found that plaintiff was not disabled within the meaning

of the Social Security Act (the Act).  That decision became the final decision of the

Commissioner on October 21, 2009, when the Appeals Council denied plaintiff's request

for review.  Plaintiff seeks review of that decision in this action.

FINDINGS AND RECOMMENDATION - 2

**Factual Background**

Plaintiff was born on February 1, 1960, and was 49 years old at the time of hearing and decision.  She completed ninth grade, and has not earned a GED.  Plaintiff worked as manager/cashier/stocker at Bimbo Bakeries from 2003 until she lost the job because of excessive absences in 2007.  That was her last full-time work.

Plaintiff alleges disability based upon a combination of physical and mental impairments.  Her diagnoses include joint and ankle pain, Complex Regional Pain Syndrome (CRPS), myofacial pain, lumbar region pain secondary to CRPS of the right foot, kyphosis, major depression, anxiety, bipolar disorder, recurrent abdominal pain, irritable bowel syndrome, asthma/chronic obstructive pulmonary disease (COPD), insomnia, and open angle glaucoma.

**Disability Analysis**

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If

the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant. <u>Tackett</u>, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  <u>Id.</u>

## <u>Medical Record</u>

### 1. <u>Physical Issues</u>

As noted above, plaintiff alleges that she has been disabled since September 23, 2006. Plaintiff was working for Bimbo Bakeries at the time, and alleges that the onset of her disability was precipitated by pain in her right foot.  Plaintiff saw David Chung, D.P.M., a number of times for corn and bunion problems during 2006.  An x-ray taken on October 3, 2006, showed a mildly contracted 5R digit with medial rotation and mild bunion, and a physical examination showed flexible hammertoe deformity with recurrent painful distal lateral deep nucleated hyperkeratosis of the 5R toe with moderate contracture.

Dr. Chung performed bunion and hammertoe surgery on plaintiff's right foot on November 16, 2006.  At that time, he indicated that plaintiff would be incapacitated for approximately 2 months.  Plaintiff had numerous follow-up visits with Dr. Chung after surgery.  In early 2007,  Dr. Chung noted that plaintiff reported moderate improvement in her pain post-surgery, and on March 6, 2007, he released her to work 20 hours per week.

Dr. Richard Alley, an Agency medical consultant, reviewed plaintiff's medical file on March 15, 2007, as part of the assessment of plaintiff's application for disability benefits. Dr. Alley opined that plaintiff could lift 20 pounds occasionally and 10 pounds frequently, could stand/walk six hours in an 8-hour day, could sit six hours in an 8-hour day, and should avoid even moderate exposure to fumes, odors, dust, gases, poor ventilation, and extreme

cold.  Dr. Linda Jensen reviewed plaintiff's medical file for the Agency on October 9, 2007.

She agreed with Dr. Alley's opinion, except that she opined that plaintiff could stand/walk

only 2 hours in an 8-hour day, and opined that plaintiff did not need to avoid exposure to

extreme cold.  Dr. Alley opined that, because plaintiff continued to smoke despite her

asthma, limitations in exposure to fumes were "probably not going to make a meaningful

change in her condition or make a work setting more tolerable, but she should avoid exposure

to airway irritants."  Dr. Alley also found that plaintiff's "reports of poorly controlled asthma

are not supported by the evidence . . . ," and opined that plaintiff's pulmonary function was

"actually pretty well preserved."

On May 29, 2007, plaintiff reported that she had shooting pain in her right foot

under the great toe joint, which worsened with weight bearing, despite her use of orthoses.

Dr. Chung prescribed Lyrica and considered cortisone injections.

In an "excuse form" directed to plaintiff's employer dated October 16, 2007,

Dr. Chung asked that plaintiff be limited to 20 hours per week, and that plaintiff not be

required to push carts.  Dr. Chung imposed these limits "until further notice."

On September 14, 2007, Dr. Patrick Williams, plaintiff's primary care physician,

treated plaintiff for an injury to her right foot sustained a day earlier when plaintiff tripped

on her deck at home.  Dr. Williams noted extensive ecchymosis to the lateral right dorsal

midfoot.  He advised plaintiff to use a wheelchair, and told her not to put weight on her right

foot.

During a visit to Dr. Williams on November 6, 2007, plaintiff complained of pain in

her right foot.  She told Dr. Williams that she had been off work because of the pain, and that

her job required her to stand on concrete surfaces and push heavy carts.  Based upon a

physical examination, Dr. Williams thought that plaintiff might have a nerve entrapment or neuroma.

Dr. Brett Stacey examined plaintiff on January 25, 2008.  Plaintiff told Dr. Stacey that she had started to experience pain in her right foot three years earlier, and that the pain increased when she wore shoes, climbed stairs, walked, or stood on hard surfaces.  Plaintiff told Dr. Stacey that elevating her foot and avoiding activities lessened the pain.  Dr. Stacey observed that plaintiff could not bear weight on her right big toe, and that she was unsteady when she squatted, rose, and hopped on each foot.  Dr. Stacey noted that plaintiff

> Has ongoing right foot pain following bunionectomy.  She meets the diagnostic criteria for Complex Regional Pain Syndrome.  She has developed secondary myofacial back pain.  As a result of her pain her sleep is disturbed, her activity is reduced, she is not working and her mood is worse.  In addition, she has a history of migraine headaches with positive family history.  She recently increased her involvement with psychologist (Michael Brent, PhD) and is followed closely by her psychiatrist, Dr. Jeffrey T. Young, MD.  She describes herself as depressed.  Denies suicidality.

Dr. Stacey recommended consideration of an EMG/NCV to rule out tarsal tunnel syndrome.

On April 16, 2009, plaintiff complained of back pain and headache at an emergency facility after her car was involved in a low speed collision.  A physician noted that plaintiff was working part time "doing maintenance," and gave her a note indicating that she should "stay home from work for 2-3 days."  Plaintiff attended six physical therapy sessions during the following weeks.  A physical therapy evaluation on April 24, 2009, produced findings "consistent with thoracic strain and compensatory strain of the cervical and lumbar spine." Notes indicated that plaintiff demonstrated postural dysfunction and experienced pain in her activities of daily living.  Notes of a session on May 14, 2009, indicate that plaintiff could not turn her neck to the left.  Plaintiff told her physical therapist that pain disturbed her sleep, and that she was unable to lift 45 to 50 pounds as was required by her regular duties at work.

2.  **Mental Issues**

Richard Hennings, Ph.D., a State Agency medical consultant, reviewed plaintiff's medical file on March 16, 2007.  Dr. Hennings concluded that plaintiff had a depressive disorder, NOS, which caused her moderate difficulties in maintaining social functioning, and mild restriction of activities of daily living and mild difficulties in maintaining concentration, persistence, or pace.  He also concluded that, because of her anxiety, plaintiff should not interact directly with the public "on a constant or frequent basis," but that plaintiff was "not significantly limited otherwise."

Jim Rowley, Psy.D., began treating plaintiff for mental problems in July, 2007. Based upon his experience with plaintiff, in a summary dated September 19, 2007, Dr. Rowley reported that plaintiff's functioning appeared "to have deteriorated as compared to her reported level of functioning before January 2007."

Dr. Ashley Horacek began treating plaintiff for mental problems on September 13, 2007, and rated her Global Assessment of Functioning (GAF) at 60 at that time.   In response to a query from plaintiff's counsel dated August 31, 2009, Dr. Horacek stated that plaintiff's ability to work would be limited by major depressive disorder and generalized anxiety disorder, and that, as of the time that she began to treat her, plaintiff's mental impairments would have caused her to be absent from work two or more days per month.

Dr. Williams completed a form captioned "Physician's Statement of Disability" on July 22, 2007.  Dr. Williams listed plaintiff's diagnoses as major depression in partial remission and anxiety.  He opined that plaintiff's symptoms of insomnia, tremor, anxiety, depression, and fatigue had first appeared in 2006, and that these symptoms had continuously disabled plaintiff since that time.  Dr. Williams indicated that plaintiff should be able to

return to work in August, 2007.  In a portion of the form that appeared to be completed by plaintiff, the "first day unable to work" is listed as August 3, 2007.

Dr. Williams, plaintiff's primary care physician, also began treating plaintiff for depression, insomnia, and anxiety in September, 2006.  On October 4, 2006, Dr. Williams opined that plaintiff needed time off work under the Family and Medical Leave Act (FMLA) because of acute exacerbation of asthma; major depression accompanied by insomnia, anorexia, and weight loss; and problems tolerating antidepressants.  Dr. Williams opined that plaintiff could need one to two weeks of counseling and needed to see a pulmonologist.

On October 11, 2007, Frank Lahman, Ph.D., affirmed the assessment that Dr. Hennings had prepared for the Agency in March of that year.  Dr. Lahman noted that plaintiff had been diagnosed with depression and anxiety, but had "recently started treatment and will likely experience improvement in the coming months."  He added that plaintiff was "still functional in terms of activities of daily living, but would probably not tolerate much public contact."  Dr. Lahman concluded that the earlier assessment was "reasonable."

Michael Brent, Ph.D., began to counsel plaintiff in the fall of 2007.  On October 11, 2007, Dr. Brent completed a form requesting that plaintiff be placed on a one-month leave of absence from work.  Dr. Brent stated that plaintiff's readiness to return to work would be reconsidered in mid-November.

On October 27, 2006, plaintiff told Dr. Williams that she had "been crying spontaneously and could not deal with the public."  Dr. Williams diagnosed depressive disorder NEC and anxiety disorder NOS.  On November 9, 2006, plaintiff told Dr. Williams that she was having difficulty sleeping, and was sleeping three hours a night, and Dr. Williams indicated that plaintiff was "showing problems from sleep deprivation."

FINDINGS AND RECOMMENDATION - 9

Dr. Jeffrey Young performed a psychological evaluation of plaintiff on December 6, 2007. Dr. Young diagnosed plaintiff with major depression, panic disorder with mild agoraphobia, and nicotine dependence, and rated her GAF at 60. Plaintiff told Dr. Young that she experienced panic attacks several times a week, was only able to sleep two or three hours a night, and had highs and lows. In a note dated January 7, 2008, Dr. Jeffery Young stated that he was treating plaintiff for "possible bipolar affective disorder."

Plaintiff experienced some improvement in early 2008, and a chart note dated February 26, 2008, indicated that plaintiff was starting a part time job and reported that she was experiencing fewer mood swings. On March 11, 2008, plaintiff told Dr. Young that she was worried about losing her job because she had difficulty concentrating. On March 31, 2008, she told Dr. Young that her mood had improved, she was "having less temper," and felt "like a more normal person."

Barbara Kollmar, LCSW, began to counsel plaintiff in February, 2009. In September, 2009, plaintiff told Kollmar that she was "losing it" and was experiencing increased anxiety and depression. She was fired from her part-time job in the spring of 2009 because of excessive absences.

**ALJ's Decision**

At the first step of the disability analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since September 23, 2006, the date of the alleged onset of her disability.

At the second step, the ALJ found that plaintiff's severe impairments included asthma, tobacco dependence, post right-foot surgery for bunion and hammertoe conditions, insomnia, anxiety, and depression.

At the third step, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled a *per se* disabling impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (the Listings).

The ALJ next assessed plaintiff's Residual Functional Capacity (RFC). The ALJ concluded that plaintiff retained the functional capacity required to perform sedentary work. He found that plaintiff could read and write, do some simple arithmetic, could walk about 2 hours in an 8-hour day, and could lift and carry 10 pounds frequently and 20 pounds occasionally. The ALJ found that plaintiff did not need a "totally clear air environment," but should avoid all exposure to dust, fumes, and gasses, needed to be able to change sitting and standing positions every 45 minutes, and could have no direct public interaction.

In assessing plaintiff's RFC, the ALJ concluded that plaintiff's statements concerning her symptoms and limitations were not credible to the extent they were inconsistent with the limitations and capabilities set out above. The ALJ found that plaintiff's credibility was undermined by her ability to perform a wide range of activities, the amount and nature of treatment plaintiff received for her impairments, and persuasive, objective medical evidence and opinions that were inconsistent with plaintiff's description of her symptoms.

At the fourth step of his analysis, the ALJ found that plaintiff could not perform her past relevant bakery work, which had included "tasks of various jobs including cashiering, retail sales, stocking and moving bread."

At the fifth step, based upon the testimony of the VE, the AlJ found that plaintiff could work as a surveillance system monitor and an electronics production worker. Accordingly, he found that she was not disabled within the meaning of the Act.

### Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  The Commissioner bears the burden of developing the record.  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

**Discussion**

Plaintiff contends that the ALJ failed to meet the burden of establishing that she could perform "other work" at step five of the disability analysis, failed to apply Rule 201.08 which required a finding of disability, failed to provide adequate reasons for rejecting the opinions of her treating physicians, failed to develop the record, failed to provide legally sufficient support for his credibility determination, and erred in relying on an incomplete evaluation form obtained from a treating psychologist.

1. **Step Five Determination**

Plaintiff contends that the ALJ failed to adequately support his conclusion, at step five, that plaintiff could perform "other work" that exists in significant numbers in the national economy. Plaintiff argues that the record does not support the ALJ's conclusion as to the number of electronic production jobs that the ALJ found, and does not support the ALJ's conclusion that she was capable of performing the surveillance-system monitoring job identified by the VE. She contends that the ALJ failed to elicit testimony supporting the VE's assertion that, though the DOT classifies the electronic production job as sedentary, it is classified as light in the Dictionary of Occupational Titles (DOT).

I disagree. As the Commissioner correctly notes, the DOT sets out the <u>maximum</u> requirements of occupations as they are ordinarily performed, and a VE "may be able to provide more specific information about jobs or occupations than the DOT." SSR 00-4p. Accordingly, a VE may testify as to the number of jobs in a particular occupational category which are performed below the maximum requirements of the category. <u>Id.</u> An ALJ may rely on a VE's testimony about the number of jobs of a particular type that exist: The VE's

expertise "provides the necessary foundation . . . [and] no additional foundation is required." Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005).

Here, the VE testified that the number of electronics production jobs he provided included only sedentary jobs, though the job is classified as light in the DOT.  He also testified that, except for the deviations from the DOT that he had indicated, his testimony was consistent with the DOT.   The ALJ was entitled to rely on the VE's testimony concerning the numbers of the electronics  production jobs in the category he cited existed at the sedentary level.  See Bayliss, 427 F.3d at 1218.  The ALJ's reliance on the VE's testimony that plaintiff could perform the requirements of the surveillance-system monitor position was also justified.  See id.


2. **Applicability of Medical Vocational Rule 201.08**

At the fifth step of disability assessment, age categories are relevant in determining whether a claimant can perform "other work" that exists in significant  numbers.  Claimants who cannot perform past relevant work, are 50-54 years old, are limited to sedentary work, and have no transferable skills, are deemed disabled.  20 C.F.R. Part 404, Subpart P, Appendix 2.  Age categories are based upon the period in which disability is being determined.  20 C.F.R. § 404.1563(b).  However, ALJs have some flexibility in applying the categories when a claimant is at the borderline of an older category:

> If [a claimant] is within a few days to a few months of reaching an older age category, and using the older age category would result in a determination that [the claimant] is disabled, [the ALJ] will consider whether to use the older age category after evaluating the overall impact of all the factors of [the] case.

Id.

At the time of the ALJ's decision, plaintiff was 86 days from her 50th birthday. Because her past work was classified as unskilled, she had no transferable skills, and the ALJ concluded that she was limited to sedentary work. If the ALJ had evaluated plaintiff under the rules that apply to persons aged 50 to 54, a category described as "closely approaching advanced age," it appears that plaintiff would have been found to be disabled. Instead, he applied the age category of "younger person" that corresponded to her actual age.

Plaintiff contends that "[t]he ALJ erred in not considering whether to use the older age category," and erred in failing to make "specific findings in the decision to support the use of [plaintiff's] chronological age." She notes that the ALJ observed that plaintiff was 46 years old "which is defined as a younger individual age 45-49, on the alleged disability onset date," and asserts that other than noting plaintiff's actual age at the hearing and to the VE, the ALJ failed to address why she "should not be treated as an individual 50 to 54 years old." Plaintiff cites provisions of the Agency's Program Operation Manual System (POMS) and Hearings, Appeals and Litigation Law Manual (HALLEX) which discuss when applying a higher age category might be appropriate and discuss additional factors, including vocational adversities, education, or work experience that are not already considered in the rules.

The Commissioner asserts that the ALJ satisfied the requirement that he consider whether to place plaintiff in an older age category for purposes of the analysis at step five. I agree. The decision shows that the ALJ was fully aware of plaintiff's date of birth and age, and the ALJ cited the regulation that required him to apply the age categories in a flexible manner, and used the expertise of a VE in evaluating the vocational factors relevant to plaintiff's case at step five. The Commissioner correctly notes that POMS and HALLEX are not judicially enforceable, and that the enforceable regulations do not "impose any obligation

to make express findings" concerning the evaluation of relevant factors where, as here, a claimant is within a few months of a higher age category at the time of the decision.  See Lockwood v. Commissioner, 616 F.3d 1068, 1072-73 (9th Cir. 2010).  The record here supports the conclusion that the ALJ considered whether to use an older age category after evaluating the factors of plaintiff's case, and that is all that was required.


3. **Opinions of Plaintiff's Treating Physicians**

A. Applicable Standards

   Because treating physicians have a greater opportunity to know and observe their patients, their opinions are given greater weight than the opinions of other physicians. Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989).  Accordingly, an ALJ must support the rejection of a treating physician's opinion with "findings setting forth specific and legitimate reasons for doing so that are based on substantial evidence in the record." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  An ALJ must provide clear and convincing reasons for rejecting a treating physician's uncontroverted opinions.  Lester v. Chater, 81 F.2d 821, 830-31 (9th Cir. 1995).  An ALJ must provide "specific and legitimate reasons," which are supported by substantial evidence in the record, for rejecting an opinion of a treating physician which is contradicted by the opinions of other doctors.  Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (citing Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998).

   An ALJ need not accept a doctor's medical opinion that "is brief, conclusory, and inadequately supported by clinical findings." Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  In

FINDINGS AND RECOMMENDATION - 16

addition, if an ALJ properly discounts a claimant's credibility, he may reject a treating physician's opinions that are based upon the claimant's self-reports.  See Rommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008).

B. Analysis

Dr. Horacek

Dr. Horacek treated plaintiff for mental issues on several occasions during the fall of 2007, and opined on August 31, 2009, that plaintiff's mental impairments would cause her to miss work two or more days per month.

Plaintiff contends that the ALJ failed to provide "specific and legitimate" reasons for rejecting that opinion.  I disagree.  The ALJ correctly noted that Dr. Horacek did not explain his opinion or indicate whether that opinion was based upon objective medical evidence, or upon plaintiff's "statements and reports."   As the Commissioner correctly observes, the record includes notes from only two "treatment contacts" between Dr. Horacek and plaintiff, and Dr. Horacek's September 13, 2007, GAF rating indicated functional difficulties that were at most moderate.  In the absence of any evidence that Dr. Horacek relied on objective medical evidence, the ALJ's concern that the opinion he expressed nearly two years after he stopped treating plaintiff was based upon plaintiff's subjective complaints is well founded. As noted above, an ALJ may reject opinions that are brief, conclusory, and inadequately supported by clinical findings, and may properly reject opinions that are based upon a claimant's self-reports if the claimant is not wholly credible.  Dr. Hornacek did not provide an objective clinical basis for his opinion, and it appeared to be based upon plaintiff's

subjective reports.  As discussed below, the ALJ here found that plaintiff was not wholly credible, and adequately supported that conclusion.

Dr. Williams, Dr. Chung, and Dr. Brent

As noted above, Dr. Williams, Dr. Chung, and Dr. Brent opined at various times that plaintiff either was not ready to return to work, or that she could not work full time.  Plaintiff contends that these doctors opined that plaintiff could not perform full time work for the consecutive 12-month period that is required to establish disability, and that the ALJ failed to provide specific and legitimate reasons for rejecting their opinions.

The ALJ concluded that these treating doctors "periodically and temporarily restricted" plaintiff from work, but that "none has offered any opinion that she has been or is expected to be unable to perform basic work activities for 12 consecutive months."  This conclusion is supported by the record.  Plaintiff correctly notes that Dr. Chung opined in October, 2007, that plaintiff would be unable to work more than 20 hours per week "until further notice."  However, Dr. Chung's restriction was directed to plaintiff's then current work at a bakery outlet, which the VE classified as a combination of light and medium exertion as performed by plaintiff.  Dr. Chung did not opine that any specific restrictions prevented plaintiff from working full time in other jobs that existed in significant numbers in the national economy.

Plaintiff's other treating doctors also opined either that plaintiff's inability to work was temporary, or simply addressed her ability to perform the duties of plaintiff's employment at the time.  On October 4, 2006, Dr. Williams opined that plaintiff would need up to two more weeks of medical leave for conditions that began in September, 2006.  On

July 22, 2007, Dr. Williams indicated that plaintiff would be able to return to work in

August, 2007.  As the Commissioner correctly notes, on the portion of the form that she

completed, plaintiff indicated that she was first unable to work on July 3, 2007.  On

October 11, 2007, Dr. Brent requested that plaintiff be granted a one-month leave of absence.

Dr. Chung indicated on January 12, 2007, that plaintiff was not ready to return to work, and

opined on February 20, 2007, that she would be ready to return to work on March 5, 2007.

Following plaintiff's automobile accident in April, 2009, Dr. Williams extended plaintiff's

"disability at work" for two more weeks "as she has no light duty option."  The

Commissioner correctly asserts that this opinion supports the conclusion that plaintiff was

able to perform light duty work, and the ALJ found that she could perform a limited range of

sedentary work.


4. __Development of Record and Missing Page from Medical Record__

A. Development of Record

After the Agency's medical consultants provided their opinions concerning plaintiff's

mental and physical condition, Dr. Young, a treating doctor, diagnosed plaintiff with a

bipolar disorder.  The ALJ did not find substantial evidence in the record supporting that

diagnosis, and concluded that, in any event, his residual functional capacity finding "contains

limitations that accommodate the symptoms claimant attributes to a bipolar disorder."

Plaintiff contends that SSR 96-6p required the ALJ "to obtain an updated medical

opinion from a medical expert" after Dr. Young diagnosed a bipolar disorder and Dr. Stacey

diagnosed plaintiff with joint and ankle pain, CRPS, Myofascial pain, and pain in the lumbar

region.  I disagree.  That Ruling provides that an ALJ "must obtain an updated medical

opinion from a medical expert . . .[w]hen additional medical evidence is received that in the

opinion of the administrative law judge . . . may change the State agency medical or

psychological consultant's finding that the impairment(s) is not equivalent in severity to any

impairment in the Listing of Impairments."   Here, there is no support for the conclusion that

the ALJ thought that Dr. Young's and Dr. Stacey's "additional medical evidence" might

change the Agency consultants' findings concerning the severity of plaintiff's impairments.

Under these circumstances, the ALJ was not required to obtain an updated opinion from a

medical expert.


B. <u>Missing Page</u>

     Jim Rowley, Psy.D., treated plaintiff four times in 2007, and completed a

psychological evaluation on September 19, 2007.  In his decision, the ALJ summarized

Dr. Rowley's evaluation, and concluded that it was based on plaintiff's self-reported

symptoms,  and was consistent with his findings that plaintiff's depression and anxiety were

severe impairments.

     Plaintiff correctly notes that one page of Dr. Rowley's evaluation is missing.  In a

letter dated August 8, 2009, ALJ Lazuran, the first ALJ to whom this case was assigned,

observed that at least one page of Dr. Rowley's evaluation was missing, and asked plaintiff's

counsel to contact her office if he had "any idea how to restore that document . . . ."  Plaintiff

now asserts that ALJ Say "made his determination without the complete evaluation . . . and

erred in not obtaining the complete record."

     The Commissioner argues that the absence of one page from the medical record does

not require that the ALJ's decision be reversed or remanded.  The Commissioner contends

FINDINGS AND RECOMMENDATION - 20

that the ALJ "found the voluminous record sufficient to enable him to determine whether Plaintiff was disabled," and that he "properly developed the record."  I agree.  The absence of one page from the extensive medical records is simply insufficient to show that either of the ALJs to whom this action was assigned failed to carry out the duty to develop medical evidence.

**ALJ's Credibility Determination**

As noted above, the ALJ concluded that plaintiff's statements concerning her symptoms and limitations were not entirely credible.  Plaintiff contends that the ALJ failed to provide legally sufficient support for that conclusion.

a. <u>Standards for Evaluating Credibility</u>

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities.  <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995).  If a claimant produces medical evidence of an underlying impairment, the ALJ  may not discredit the claimant's testimony concerning the severity of symptoms merely because they are unsupported by objective medical evidence.  <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998) <u>citing</u> <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 343 (9th Cir. 1990)(*en banc*).  Unless there is affirmative evidence that the claimant is malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony.  <u>Id.</u>, quoting <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1995).

An ALJ rejecting a claimant's testimony may not simply provide "general findings," but instead must identify the testimony that is not credible and the evidence that undermines

the claimant's complaints.  Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  In addition,

SSR 96-7 requires an ALJ to consider the entire record and to consider several factors,

including the claimant's daily activities, medications taken and their effectiveness, treatment

other than medication, measures other than treatment used to relieve pain or other symptoms,

and "any other factors concerning the individual's functional limitations and restrictions due

to pain or other symptoms."  An ALJ may support a determination that the claimant was not

entirely credible by identifying inconsistencies or contradictions between the claimant's

complaints and his activities of daily living.  Thomas v. Barnhart, 278 F.3d 947, 958-59

(9th Cir. 2002).


B. Analysis

        The ALJ here found that plaintiff had produced objective medical evidence of

impairment that could reasonably cause the symptoms she alleged, and did not find evidence

of malingering.  He was therefore required to provide clear and convincing reasons for his

conclusion that her statements concerning the intensity, persistence, and limiting effects of

her symptoms were not wholly credible.

        In support of his credibility determination, the ALJ first cited plaintiff's daily

activities.  The ALJ asserted that these were "quite involved and suggest a level of

functioning greater than what she has alleged in her application and testimony."  He noted

that, though plaintiff testified that she did not go grocery shopping because she could not deal

with the public and had "tantrums," plaintiff's mother reported that she did go out on her own

and did go grocery shopping.  The ALJ noted that, though plaintiff testified that she did not

watch television or read newspapers because of her "racing thoughts" and inability to focus,

medical records showed that, by reading, plaintiff was "able to self-educate regarding various medical issues such as bipolar disorder, Lithium treatment, and sleep hygiene." He also noted that plaintiff's mother reported that plaintiff's hobbies included watching television and reading. The ALJ also noted that, though plaintiff stated that she did not take care of anyone, she in fact cared for her 75-year-old husband who was suffering from dementia.

The ALJ next asserted that plaintiff's statements concerning the location, duration, frequency, and intensity of her pain and other symptoms, as well as the "factors that precipitate and aggravate her symptoms," were not credible "considering the totality of the evidence in the record." He noted that plaintiff testified that, during her shopping tantrums, she yelled at people who were in her way and threw things, and opined that she "would likely have been arrested for such behavior and no evidence of record supports this."

The ALJ further asserted that plaintiff's use of medications and history of treatment did not "suggest the presence" of impairments that were as severe as plaintiff described. He opined that the infrequency with which pain medication had been prescribed was "not indicative" of the level of "intractable pain" that plaintiff described. The ALJ also asserted that the treatments plaintiff had received for "allegedly disabling impairments" were "essentially routine and conservative in nature." He asserted that the limited record of counseling suggested that plaintiff's mental impairments did not result in significant functional limitation that precluded basic work activity.

The ALJ provided clear and convincing reasons supporting his credibility determination, and these reasons were supported by substantial evidence in the record. The record included evidence of daily activities that were inconsistent with the degree of impairment that plaintiff described. The ALJ's conclusion that plaintiff received

FINDINGS AND RECOMMENDATION - 23

conservative treatment for her mental and physical impairment was supported by the record, and provides a valid basis for finding that plaintiff's description of her impairments was not wholly credible.  See, e.g., Parra v. Astrue, 481 F.3d 742, 750-51 (9th Cir. 2007).  It may be that the ALJ was mistaken in suggesting that the shopping tantrums plaintiff described would be expected to result in an arrest.  However, the incidents she described would be expected to result in some sort of record, or would at least be noted elsewhere in the record, and they are not.

## Conclusion

The Commissioner's decision denying plaintiff's applications for benefits should be AFFIRMED, and a judgment should be entered dismissing this action with prejudice.

## Scheduling Order

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due July 18, 2011.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 29th day June, 2011.


/s/ John Jelderks_____
John Jelderks
U.S. Magistrate Judge


FINDINGS AND RECOMMENDATION - 24